# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRITTMARIE HARWE, JANET LEVY, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | No. 3:09cv1027 (MRK) |
| v. | : | |
| | : | |
| RONALD FLOYD, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF DECISION

This case concerns the lawfulness of an investigatory traffic stop that occurred in front of the Hooters Restaurant in Wethersfield, Connecticut on April 8, 2009. At approximately 10:00 p.m. that night, non-party Luis Gonzales and Defendant Ronald Floyd, both officers of the Wethersfield Police Department, stopped a 2003 Mercedes SL500 convertible driven by Plaintiff Janet Levy. Plaintiff Brittmarie Harwe was a passenger in Ms. Levy's Mercedes. Ms. Levy and Ms. Harwe assert claims against Officer Floyd under 42 U.S.C. § 1983, alleging that his actions violated their rights under the Fourth Amendment to the United States Constitution. Ms. Levy and Ms. Harwe both allege that the scope and duration of the investigatory traffic stop was unreasonable. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). Ms. Levy further alleges that Officer Floyd used excessive force against her during the investigatory traffic stop. *See Graham v. Connor*, 490 U.S. 386, 394 (1989).

At the outset, the Court notes that being stopped by a police officer on suspicion of driving under the influence of alcohol is undoubtedly an unpleasant experience – particularly

when the stop occurs on an otherwise celebratory occasion, as it did for Ms. Levy and Ms. Harwe. We all hope that police officers will act politely during such encounters. Indeed, states, cities, and police departments are free to put regulations and procedures in place to help ensure that they do so. But the Fourth Amendment to the United States Constitution does not require police encounters to be pleasant, and it does not require police officers to be polite. Instead, at its core, it requires that police officers act reasonably in the course of discharging their duties. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("[T]he ultimate touchstone of the Fourth Amendment is reasonableness . . . .").

Pending before the Court is Officer Floyd's Motion for Summary Judgment [doc. # 41] pursuant to Rule 56(a) of the *Federal Rules of Civil Procedure*. Officer Floyd argues that he is entitled to summary judgment on all of the claims against him on the basis of qualified immunity. *See Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010). First, he argues that there are no disputed issues of material fact in this case, and that the facts in the record before the Court do not make out any Fourth Amendment violation. *See id.* Second, he asserts that even if his actions did violate the Fourth Amendment, he is nevertheless entitled to judgment it was objectively reasonable from him to believe that his actions were lawful at the time when they occurred. *See id.* at 134

For the reasons set forth below, the Court concludes that Officer Floyd is entitled to summary judgment on Ms. Levy's and Ms. Harwe's scope and duration claim. However, the Court also concludes that there are genuine disputes of material fact that preclude the Court from

granting summary judgment in Office Floyd's favor on Ms. Levy's excessive force claim. Officer Floyd's Motion for Summary Judgment is therefore GRANTED in part and DENIED in part.[1]

## I.

Because this case is currently at the summary judgment stage, the Court sets forth the facts in the light most favorable to Ms. Levy and Ms. Harwe, the nonmoving parties here. *See, e.g.*, *DeFabio v. E. Hampton Union Free Sch. Dist.*, 623 F.3d 71, 74 (2d Cir. 2010) (per curiam). Unless the Court notes otherwise, the facts set forth in this Memorandum of Decision are undisputed.

On April 8, 2009, Janet Levy and Brittmarie Harwe took a trip from their homes in Connecticut to Massachusetts. During the day, Ms. Harwe attended a doctor's appointment at the Lahey Clinic Medical Center in Burlington, a facility affiliated with the Tufts University School of Medicine. The purpose of Ms. Harwe's appointment was to follow up on a surgery Ms. Harwe had undergone to restore her ability to swallow, which she had lost due to a stroke she suffered some sixteen years earlier. Ms. Levy, who had also suffered a stroke in the past and still had some physical limitations because of it, agreed to drive Ms. Harwe to and from the appointment in her 2003 Mercedes SL500 convertible.

That night, Ms. Levy and Ms. Harwe had a celebratory dinner at a Legal Sea Foods restaurant, part of a national chain specializing in classic seafood dishes. At their dinner, the pair ordered two baked scrod dinners, one chocolate pudding, two Diet Cokes, and three glasses of Hess Allomi Cabernet Sauvignon red wine. Although the pair ordered and paid for three glasses of wine, Ms. Levy and Ms. Harwe each claim they only drank one glass. Ms. Harwe sent her first glass back because she thought it tasted sour. Ms. Levy and Ms. Harwe paid for their dinner just

---

[1] As a result of the Court's decision, Ms. Harwe is terminated as a Plaintiff in this case.

after 7:00 p.m. Sometime later on, they got back into Ms. Levy's Mercedes and headed back to Connecticut.

Around 10:00 p.m., Ms. Levy was driving her Mercedes on Interstate 84 West through East Hartford, Connecticut, and a police cruiser driven by Officer Luis Gonzales of the Wethersfield Police Department Started following her. Officer Ronald Floyd was a passenger in the police cruiser. Ms. Levy observed a car driving behind her, but did not recognize that it was a police cruiser. When the Mercedes approached the left-side exit onto Connecticut Route 5-15 – commonly known as the Berlin Turnpike – Ms. Harwe instructed Ms. Levy to turn left into the exit lane. Without using her turn signal, Ms. Levy quickly swerved left into the exit lane and merged onto the Berlin Turnpike.

Officers Gonzales and Floyd followed the Mercedes for approximately five more miles down the Berlin Turnpike into Wethersfield. Although Ms. Levy alleges that she never swerved while driving on the Berlin Turnpike, Officer Floyd's version of the facts is substantially different:

> As I travelled behind the accused I observed her vehicle drift to the right so that her right tires crossed the solid white fog line separating right southbound travel lane from the emergency breakdown lane. The vehicle drifted back to the left so that it was travelling within the right southbound travel [lane] shortly thereafter. As I followed the accused I observed her vehicle drift between the breakdown lane and the right southbound travel lane in the same manner three additional times.

Ex. F to Mot. for Summary J. [doc. # 41-12] at 3; *see also* Floyd Aff. [doc. # 41-4] ¶ 6 ("After Ms. Levy swerved onto the Route 5-15 Connector, Office Gonzales followed Ms. Levy's vehicle into Wethersfield, where it continued to swerve between lanes . . . .").[2] Then – at 10:18 p.m.

---

[2] Officer Gonzales' affidavit mentions the swerve into the exit lane from Interstate 84 West, but not the three additional swerves on the Berlin Turnpike. *See* Gonzales Aff. [doc. # 41-5] ¶¶ 5-6.

according to both the ticket Officer Floyd wrote, *see* Ex. F to Mot. for Summary J. [doc. # 41-12] at 3, and the Computer Aided Dispatch ("CAD") report kept by the Wethersfield Police Department, *see* Ex. H to Mot. for Summary J. [doc. # 41-14] at 2 – Officer Gonzales pulled the Mercedes over in front of the Hooters Restaurant on the Berlin Turnpike in Wethersfield.[3]

After both cars stopped, Officer Floyd exited the police cruiser and approached the driver's side of the Mercedes, while Officer Gonzales approached the passenger's side. Officer Floyd shined his flashlight into the driver's side window of the Mercedes, prompting Ms. Levy to roll down her window. When Ms. Levy asked what was wrong, Officer Floyd asked for her license, registration, and proof of insurance. Officer Floyd examined Ms. Levy's license, registration, and proof of insurance; asked her who owned the Mercedes; and again shined his flashlight into the Mercedes. Officer Floyd then asked Ms. Levy and Ms. Harwe whether they had been drinking. Ms. Levy and Ms. Harwe told Officer Floyd they had not been drinking. Officer Floyd responded: "It reeks of alcohol in here. Where were you girls drinking?" Ex. C to Mot. for Summary J. [doc. # 41-6] at 10. Ms. Levy and Ms. Harwe insisted that they had not been drinking. Officer Floyd noticed that Ms. Levy was chewing gum, and asked Ms. Levy: "You're chewing gum, aren't you?" *Id.* Ms. Levy confirmed that she was chewing gum, and Officer Floyd asked her: "Why are you chewing gum?" *Id.* Ms. Levy responded: "Because I always chew gum." *Id.*

Ms. Levy and Ms. Harwe repeatedly told Officer Floyd that they had not been drinking.

---

Counsel for Ms. Levy and Ms. Harwe could have taken Officer Gonzales' deposition and asked him whether he, like Officer Floyd, saw Ms. Levy swerve while driving on the Berlin Turnpike. But counsel for Ms. Levy and Ms. Harwe apparently declined to do so.

[3] Ms. Levy and Ms. Harwe believe that the stop may have occurred before 10:18 p.m., but they have not introduced any evidence to supports their belief that the stop occurred before 10:18 p.m. into the record. Neither Ms. Levy nor Ms. Harwe can remember exactly when the incident began and – understandably – neither thought to write it down.

When Officer Floyd asked again: "Where were you girls drinking?", Ms. Levy explained that they had just come from a doctor's appointment in Boston, and showed Officer Floyd their parking pass from the Lahey Clinic. *Id* at 10-11. Officer Floyd responded: "I don't care about that. . . . I want to know where you girls were drinking." *Id.* at 11. Ms. Levy and Ms. Harwe insisted that they had not been drinking, but at some point, they acknowledged that they had each had one glass of wine at dinner. Officer Floyd then asked again where they had been drinking, and threatened that if they did not admit they had been drinking, he would handcuff them and take them both back to the police station. Eventually, Officer Floyd counted down from five to one and said: "Now you've done it." *Id.* When Ms. Levy reached down to turn off the Mercedes' engine – it was still running – Officer Floyd reached into the Mercedes, grabbed Ms. Levy's hand along the keys, and removed the keys from the Mercedes' ignition. Officer Floyd then told Ms. Levy to get out of the Mercedes. Ms. Levy complied.

When Ms. Levy exited, Officer Floyd told her to walk to the front of the Mercedes. At that point, Officer Floyd began administering standard field sobriety tests, including the horizontal gaze nystagmus (HGN) test, which measures the extent to which a person's eyes jerk as they follow an object from one side of the person's field of vision to the other. *See Leibin v. Town of Avon*, No. 3:08cv266 (MRK), 2010 WL 3038100, at *2 (D. Con. Aug. 4, 2010). Ms. Levy was unable to perform the one leg stand test. *See Pennsylvania v. Muniz*, 496 U.S. 582, 585 n.1 (1990) ("The 'one leg stand' test requires the subject to stand on one leg with the other leg extended in the air for 30 seconds, while counting aloud from 1 to 30."). When Ms. Levy failed that test – she could only stand on her left leg briefly before it would start shaking – she pleaded to Officer Floyd that the reason she could not perform the test was that she was a stroke victim. Ms. Levy asked Officer Floyd to examine "the proof," Ex. 3 to Mem. in Opp. [doc. # 47-4] at 15-

16, apparently referring to some proof of her medical condition inside the Mercedes, or to the receipt from the dinner at Legal Sea Foods, *see* Ex. E to Mot. for Summary J. [doc. # 41-11], or perhaps to both.[4] Ms. Levy begged Officer Floyd: "If I show you the proof, then you will know that I'm telling the truth. I know a lot of people don't tell the truth at stops, but I'm telling you the truth. Don't do this to another victim. Please don't victimize the victim." Ex. 3 to Mem. in Opp. [doc. # 47-4] at 15.[5]

Despite Ms. Levy's repeated and impassioned pleas – although she did not cry during the tests, she describes herself as having been on the verge of tears while Officer Floyd administered the tests, *see id.* at 20 – Officer Floyd insisted that Ms. Levy also attempt to perform the walk and turn test. *See Muniz*, 496 U.S. at 585 n.1 ("The 'walk and turn' test requires the subject to walk heel to toe along a straight line for nine paces, pivot, and then walk back heel to toe along the line for another nine paces. The subject is required to count each pace aloud from one to nine."). Ms. Levy could not perform the walk and turn test without her left leg shaking. Officer Floyd said: "Now, do it when your left leg isn't shaking." Ex. 3 to Mem. in Opp. [doc. # 47-4] at 16. Ms. Levy again explained that she could not complete the test because of her stroke, and she

---

[4] Although a Legal Sea Foods receipt was indeed inside the Mercedes at the time, there is no evidence that Ms. Levy actually had any documentation regarding her medical condition in the Mercedes. Furthermore, the Legal Sea Foods receipt is not "proof" that she had not been drinking. All that the receipt shows is that Ms. Levy drank at least one glass of wine and as many as three glasses of wine at Legal Sea Foods that night. She might also have consumed alcohol elsewhere.

[5] When Ms. Levy asked Officer Floyd not to "victimize the victim," Ex. 3 to Mem. in Opp. [doc. # 47-4] at 15, she was apparently referring to the fact that both she and Ms. Harwe were stroke victims. During her deposition, Ms. Levy expressed particular concern that Officer Floyd's actions ruined the special day on which Ms. Harwe recovered her ability to swallow. *Id.* at 17 ("This woman has been through too much. Please don't do this to her."); Ex. C to Mot. for Summary J. [doc. # 41-6] at 19 ("Q: Were you upset, not only by the fact that you had been stopped, . . . but that this was a special day, and did that make it all the more upsetting to you? A: All the more . . . .").

asked Officer Floyd: "Do you want to see my scar? I can show you the scar." *Id.* Officer Floyd replied: "I don't want to see your scar. . . . How do I know you had a stroke? . . . Are you on medication?" *Id.* When Ms. Levy she was not on any medication, Officer Floyd asked, "Do you use a cane?" *Id.* Ms. Levy responded: "No, but I have the scar to prove it, and I've got the proof in the car, if you will just look." *Id.* Officer Floyd at that point said: "I'm not interested." *Id.*6

After Ms. Levy failed the two tests and Officer Floyd decided not to immediately examine the "proof" Ms. Levy offered to show him, Officer Floyd asked Ms. Levy to follow him to the police cruiser. As Ms. Levy approached the rear passenger's side door of the police cruiser, Officer Floyd grabbed and pulled her arm and used force to put her into the police cruiser. As Ms. Levy attempted to climb into the backseat of the police cruiser, she hit her head against the police cruise. According to Ms. Levy's deposition testimony:

> I hit my head going in, because there was no leg room, because you sit on these vinyl seats – not vinyl – plastic seats. And there's this much leg room and you can't get in there. So, he didn't care. Like, when he pulled my arm, and then he was, like, get in. It was tough for me to get in. I hit my head and I went back with my head. So, then he kind of like pushed with his body, but not – he wasn't trying to push. I mean, his body [was] against me so I couldn't go anyplace else.

*Id.* at 18. Again according to Ms. Levy's deposition testimony, she hit her head on the police cruiser as Officer Floyd "kind of guided me in, from, you know, like, not pushing me. I'm not going to say pushed me, but, like, as he's guiding me into the car." *Id.* at 25.

As Ms. Levy was still trying to get inside the police cruiser, Officer Floyd decided to quickly close the door. Ms. Levy speculated at her deposition that Officer Floyd "closed [the door] pretty fast" because "[h]e thought I was going to run away." *Id.* at 26. When he did so, Ms. Levy's right leg was still sticking out of the car, and the door hit her on the right shin as it closed.

---

[6] Again, there is no evidence in the record that Ms. Levy actually had documentary proof regarding her medical condition inside of the Mercedes.

According to Ms. Levy's deposition testimony: "I sat down. And because I was in with no room, at that point, when I'm sitting down and plopped into the seat, I have to physically take my leg and move it over. And my other leg was dangling out of the door, and he slammed . . . the leg in the car door." *Id.* at 20. [7] Ms. Levy does not believe that Officer Floyd "intentionally tried to close the police cruiser door on her foot," but instead asserts that "[h]e was just mean and rude and he didn't care." *Id.* at 28. Ms. Levy's right shin prevented the door from closing fully. Ms. Levy asked Officer Floyd: "Can you wait?" *Id.* at 27. Officer Floyd then waited as Ms. Levy pulled her right leg into the police cruiser, and closed the door without incident after she was fully inside the police cruiser.

After closing the police cruiser door, Officer Floyd said to Ms. Levy: "You will sit there until you tell me when and where you girls were drinking tonight." *Id.* at 25. At that point, Officer Floyd walked away from the car. Several minutes passed – the exact timing is in dispute – and at some point while Ms. Levy was still sitting and waiting, a second Wethersfield Police Department cruiser arrived on the scene. Officer Floyd had a conversation with the other officers when they arrived. After a few minutes – a total of ten or fifteen minutes, according to Ms. Levy[8] – Officer Floyd returned to his police cruiser and asked: "So now, can you tell me where you were drinking?" *Id.* at 30. Ms. Levy replied: "We weren't. I told you we weren't, we weren't drinking . . . . I told you about the glass of wine, that's it . . . ." *Id.* Office Floyd then asked:

---

[7] Mr. Levy testified at her deposition that the door left a black and blue mark on her left shin, and that she showed the mark to her husband. However, she never sought treatment for the injury, and she did not introduce any photographs or other evidence regarding her injuries into the record.

[8] As the Court explains in further detail below, Ms. Levy's estimates about the amount of time she sat waiting inside the police cruiser are inconsistent with other documentary evidence in the record regarding the total length of the investigatory traffic stop. Ms. Levy has not provided any evidence to contest or refute the accuracy of that documentary evidence.

"That's your final answer?" *Id.* When Ms. Levy said it was her final answer, Officer Floyd responded:

> Well, you know what I'm going to do? I'm going to go over to your friend right there and I'm going to go over to her door, and I'm going to open it up, and I'm going to ask her where you guys have been drinking all night. And if she tells me – she's going to tell me where, because I'm going to make her tell. And when she tells me where you were drinking last night, and I'm going to come back to you, and if you don't tell me exactly what she told me, I'm going to take you down to the station in handcuffs. Do you understand me?

*Id.* at 30-31. Ms. Levy indicated that she understood, and Officer Floyd left the police cruiser.

Officer Floyd then went back to the Mercedes to talk to Ms. Harwe. Ms. Harwe showed Officer Floyd the receipt from Legal Sea Foods, which indicated that the pair had ordered three glasses of wine. Officer Floyd returned to the police cruiser and told Ms. Levy that Ms. Harwe had admitted that the pair had been drinking. Ms. Levy protested: "We weren't." *Id.* at 31. Officer Floyd responded: "She told me where you were drinking tonight. This is your last chance. I'm going to take you down to the station in handcuffs. Do you understand me?" *Id.* at 31-32. Ms. Levy insisted they had not been drinking, and Officer Floyd replied: "That's not what your friend said." *Id.* at 32. Ms. Levy responded: "I'm sure she didn't say that, because it wouldn't have been true." *Id.* Officer Floyd said, finally, "Okay, you're going to stay in there." *Id.* He then slammed the door and walked away.

Ms. Levy alleges that after Officer Floyd walked away, he left her sitting in the police cruiser for another twenty to thirty minutes.[9] Including the initial alleged ten to fifteen minute period when Ms. Levy sat in the police cruiser, Ms. Levy thus claims that she sat in the police cruiser for a total of thirty to forty-five minutes. She claims that she is quite certain she sat in the

---

[9] Again, Ms. Levy's time estimates are inconsistent with documentary evidence which she has not meaningfully disputed.

police cruiser for that length of time because she was wearing a watch that night, and because noticed that she was still in the police cruiser at 11:10 p.m. Ms. Levy claims that while she waited the second time, another officer on the scene stood by the police cruiser pointing and laughing at her.[10] Eventually, Officer Floyd return to the police cruiser, allowed Ms. Levy to return to her Mercedes, wrote a ticket for an improper lane change, and returned the keys to Ms. Levy. Ms. Levy and Ms. Harwe then left the scene. Later on, Ms. Levy successfully contested her improper lane change ticket.

According to the Wethersfield Police Department's CAD report, Officers Floyd and Gonzales left the scene at 10:43 p.m. According to the CAD report, then, the entire investigatory traffic stop lasted a total of twenty-one minutes. *See* Ex. H to Mot. for Summary J. [doc. # 41-14] at 2. The Wethersfield Police Department also uses an electronic entry system at its headquarters, and records from that system show that Officer Gonzales entered the headquarters at 10:48 PM. *See* Scales Aff. [doc. # 41-16]. Ms. Levy's own cellular telephone records also confirm that approximate timing. *See* Ex. K to Mot. for Summary J. [doc. # 41-17]. According to Ms. Levy, it took her approximately seven to ten minutes to drive from the scene of the investigatory traffic stop to Ms. Harwe's home. As soon as Ms. Levy dropped Ms. Harwe off, she called her husband. Ms. Levy's telephone records show that she placed that call at 10:56 p.m. *See id.* Thus, even it the drive took seven minutes – the low end of her estimate of the driving time – then the investigatory traffic stop must have concluded no later than 10:49 p.m, and the entire incident

---

[10] Ms. Levy has never alleged that *Officer Floyd* pointed at her or laughed at her, and there is no evidence that he did. Instead, according to her deposition testimony, the driver of the other police cruiser pointed at her as if he were laughing at her. *See* Ex. [doc. # 47-4] at 32 (""They stood there . . . and they were pointing at me, and this – the driver, kept pointing and like, like they were laughing at something . . . .").

lasted no longer than thirty-one minutes.[11]

Ms. Levy and Ms. Harwe filed a Complaint against Officer Floyd in this Court on June 26, 2009. They then filed an Amended Complaint [doc. # 24] on November 30, 2009. On December 10, 2010, Officer Floyd moved to dismiss Ms. Harwe's claim pursuant to Rule 12(b)(6), arguing among other things that Ms. Harwe was not seized within the meaning of the Fourth Amendment during the traffic stop. *See* Amend. Mot. to Dismiss [doc. # 26]; Mem. in Supp. of Mot. to Dismiss [doc. # 14-1] at 4. On February 19, 2010, the Court denied the Motion to Dismiss in a brief electronic order, relying on the Supreme Court's holding in *Brendlin v. California*, 551 U.S. 249 (2007), that when a police officer makes a traffic stop, the passenger as well as the driver is seized. *See id.* at 251. After the close of discovery, Officer Floyd filed the pending Motion for Summary Judgment. The Court held oral argument on the Motion for Summary Judgment on January 14, 2011.

## II.

This Court must apply a familiar standard when resolving a motion for summary judgment. Summary judgment is appropriate only when the "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" submitted to the Court "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(A); Fed. R. Civ. P. 56(a). "As to materiality, the substantive law governing the case will identify those facts that are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment must

---

[11] Again Ms. Levy and Ms. Harwe can only guess that the incident began before 10:18 p.m. They have not offered any proof whatsoever that it began earlier than 10:18 p.m.

be rejected "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). However, the party against whom summary judgment is sought cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts," and instead "must come forward with specific facts showing that there is a *genuine issue* for trial." *Matshushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986) (quotation marks and citations omitted).

### III.

In each of the two § 1983 claims in this case, Ms. Levy and Ms. Harwe assert that Officer Floyd's actions during the investigatory traffic stop violated the Fourth Amendment. As the Court noted at the outset, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Stuart*, 547 U.S. at 403. Although the reasonableness of a police officer's actions is often a jury question, that is not always so. In some cases, the record at the summary judgment stage allows a district court to conclude that a defendant officer's actions were reasonable as a matter of law. *See, e.g.*, *Tracy v. Freshwater*, 623 F.3d 90, 97-98 (2d Cir. 2010) (partially affirming the district court's grant of summary judgment for the defendant based on a finding that two of the three actions the plaintiff complained of were objectively reasonable under the circumstances).

After careful consideration, the Court concludes that Officer Floyd is entitled to summary judgment on Ms. Levy's and Ms. Harwe's claim regarding the scope and duration of the investigatory traffic stop. There are certainly some factual disputes related to that claim – specifically, there is some dispute about exactly how long the investigatory traffic stop lasted – and Ms. Levy is surely correct that genuine disputes regarding the material facts would preclude this Court from granting summary judgment on that claim. *See, e.g.*, *Breen v. Garrison*, 169 F.3d

152, 153 (2d Cir. 1999). However, the parties' factual disputes regarding the scope and duration claim are ultimately immaterial. Even if the disputed facts regarding that claim are viewed in the light most favorable to Ms. Levy and Ms. Harwe, Officer Floyd is still entitled to judgment as a matter of law because even if a jury were to accept their version of the facts, a reasonable jury would have to conclude that the scope and duration of the investigatory traffic stop was reasonable.

However, Ms. Levy's excessive force claim cannot be resolved at the summary judgment stage. The factual disputes related to that claim – to name a few, whether Ms. Levy was fully compliant when Offer Floyd decided to use force against her; whether it was even necessary for Officer Floyd to use even minimal physical force when placing Ms. Levy in the police cruiser; and whether Officer acted with reckless disregard of the possibility the force he used in placing her in the police cruiser and in closing the door quickly could result in physical injury to Ms. Levy – are indeed material to the outcome. The Court is well aware that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," *Graham*, 490 U.S. at 397 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J.)), and that this case involves little – if anything – more than ordinary, minimal pushes and shoves. Nevertheless, the Court hesitantly concludes after much careful deliberation that there is some possibility that a reasonable jury could find for Ms. Levy on her excessive force claim. The *Federal Rules of Civil Procedure* do not authorize this Court to ignore that possibility, no matter how remote it may seem.

## A.

Ms. Levy's and Ms. Harwe's first claim is that the scope and duration of the investigatory traffic stop was unreasonable. Officer Floyd asserts that he is entitled to qualified immunity on

that claim. "Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Tracy*, 623 F.3d at 95-96 (quotation marks and citation omitted). "Accordingly, when a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a . . . constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Id*. at 96. This Court has the sound discretion to "decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009). However, beginning with a "discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all," and the Court will therefore begin with the first prong of the qualified immunity analysis in this case. *Id.*; *see, e.g.*, *Tracy* 623 F.3d at 96.

The Fourth Amendment prohibits unreasonable seizures, and an investigatory traffic stop, no matter how brief and no matter how minimally intrusive, is a seizure within the meaning of the Fourth Amendment. *See Gilles v. Repicky*, 511 F.3d 239, 244-45 (2d Cir. 2007) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)). Any passengers inside a vehicle as well as the driver are seized during the course of an investigatory traffic stop. *See Brendlin*, 551 U.S. at 251. Just like any other seizure, a seizure of a driver and a passenger during an investigatory traffic stop must be reasonable in order to comply with the Fourth Amendment. *See Gilles*, 511 F.3d at 245.

The parties do not dispute that Officer Floyd's initial decision to stop Ms. Levy and Ms. Harwe was reasonable. However, the Fourth Amendment's reasonableness requirement does not just apply to the initial decision to initiate an investigatory detention. *See Terry v. Ohio*, 392 U.S. 1, 20 (1968) ("[O]ur inquiry is a dual one – whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."). "It has long been the law that 'an investigatory detention must be temporary and last no longer than necessary to effectuate the purposes of the stop. Similarly, the investigative means employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'" *Gilles*, 511 F.3d at 245 (citing *Royer*, 460 U.S. at 500 (plurality opinion)). In other words, both the scope and the duration of an investigatory detention must be reasonable. *See United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995) ("If an investigative detention is properly premised upon articulable suspicion, the next inquiry is whether its scope and duration are reasonable.").

The facts relevant to Ms. Levy's and Ms. Harwe's scope and duration claim, taken in the light most favorable to Ms. Levy and Ms. Harwe, are as follows. Sometime after 10:00 PM on April 8, 2009, Officer Floyd observed Ms. Levy's Mercedes suddenly swerve off of Interstate 84 West onto the Berlin Turnpike without signaling.[12] Officer Gonzales and Officer Floyd followed

---

[12] Officer Floyd wrote in a police report that he observed Ms. Levy's Mercedes swerve three more times on the Berlin Turnpike. *See* Ex. F to Mot. for Summary J. [doc. # 41-12] at 3; Floyd Aff. [doc. # 41-4] ¶ 6. Ms. Levy disputes that assertion, *see* Pl.'s Rule 56(a)2 Statement [doc. # 47-1] at 4, but there does not appear to be any actual evidence in the record – including in Ms. Levy's deposition testimony – to contradict Officer Floyd's assertion that the Mercedes swerved three times while on the Berlin Turnpike. Nevertheless, out of an abundance of caution, the Court will assume there is a genuine dispute regarding the additional swerving for purposes of this decision.

the Mercedes for several miles before pulling the Mercedes over at approximately 10:18 PM.[13] Officer Floyd asked for Ms. Levy's identification and other documents, and asked Ms. Levy and Ms. Harwe about whether they had been drinking.[14] Ms. Levy admitted that she drank a glass of wine at dinner, but insisted that she had not been drinking. Officer Floyd grabbed Ms. Levy's hand and keys and told her to exit the Mercedes. Ms. Levy failed two field sobriety tests, and while the tests were being administered she was on the verge of tears and constantly begging Officer Floyd to stop the test. Officer Floyd ignored Ms. Levy's excuse that she failed those tests because of a physical disability, and declined to immediately take her back to the Mercedes to examine the "proof" she said was inside the Mercedes. Instead, he placed Ms. Levy in the police cruiser and threatened to arrest her if she did not admit she had been drinking. He then left the car for several minutes, and while he was away from the car, he talked to other officers on the scene. When he returned, he gave Ms. Levy one more chance to admit she had been drinking, and then informed Ms. Levy that he was going to question Ms. Harwe about whether they had

---

[13] Ms. Levy and Ms. Harwe believe that the stop occurred before 10:18 p.m. However, they have not introduced any evidence that supports their belief that the CAD report is inaccurate. As such, they raise only a "metaphysical doubt" about when the stop occurred. *Matshushita*, 475 U.S. at 586.

[14] Although Officer Floyd adamantly insists that he smelled alcohol on Ms. Levy's breath, Ms. Levy and Ms. Harwe both assert that "he could not have smelled alcohol" in the Mercedes since they had not in fact been drinking. Levy Aff. [doc. # 42-7] ¶ 6; Harwe Aff. [doc. # 42-3] ¶ 6. Again out of an abundance of caution, the Court accepts Ms. Levy's and Ms. Harwe's assertions for purposes of this decision. However, the Court notes that it is rather doubtful that Ms. Levy's and Ms. Harwe's assertions alone are sufficient to create a genuine factual dispute regarding whether Officer Floyd actually smelled alcohol. *See, e.g.*, *Leibin*, 2010 WL 3038100, at *6 ("In support of the proposition that Officer Cruz could not have smelled alcohol, Mr. Leibin initially argued only that he had brushed his teeth following dinner – during which he consumed a glass of wine – and before the traffic stop, and therefore it was impossible for Officer Cruz to have smelled alcohol. To say this is a thin reed upon which to create an issue of material fact would be charitable."). If that were the case, virtually anyone stopped on suspicion of drunk driving could file a baseless § 1983 lawsuit, avoid summary judgment, and coerce a settlement from the defendant officer.

been drinking. Officer Levy left Ms. Levy again, questioned Ms. Harwe in the Mercedes, and examined the receipt from the dinner at Legal Sea Foods in Boston. He returned to the police cruiser and told Ms. Levy that she should admit she had been drinking because Ms. Harwe had admitted they were drinking. When Ms. Levy refused, he left the Mercedes again and had a conversation with other officers on the scene. At that time, one of the other officers pointed and laughed at Ms. Levy. After several more minutes, Officer Floyd returned to the police cruiser, escorted Ms. Levy back to the Mercedes, gave her a ticket for changing lanes without signaling, and let her and Ms. Harwe go. The investigatory traffic stop ended at 10:49 PM, only thirty-one minutes after it began.[15]

No reasonable jury could find based on those facts that the scope and duration of the investigatory traffic stop case was unreasonable. First, as to the scope of the investigatory traffic stop, the purpose of the stop is a relevant factor for the Court to consider. *See Gilles*, 511 F.3d at 245. Ms. Levy and Ms. Harwe seem to believe that the purpose of the stop was only to investigate an unlawful lane change, but it is apparent that Officer Floyd was actually investigating Mr. Levy based on his suspicion that she was driving under the influence of alcohol. Practically the first thing he did when he stopped the Mercedes was to ask Ms. Levy and Ms. Harwe where they had been drinking. Although there are no Second Circuit decisions directly on point, the Court has little difficulty concluding that even if Officer Floyd lied about smelling alcohol emanating from the car, it was reasonable for Officer Floyd to suspect that Ms. Levy was driving under the influence based solely on Ms. Levy's sudden, signal-less highway

---

[15] Although Ms. Levy remembers looking at her watch in the police cruiser and seeing that it was 11:10 PM, she also concedes that she made a phone call to her husband at 10:56 PM, at the very least seven minutes after the incident ended. *See* Ex. K to Mot. for Summary J. [doc. # 41-17].

lane change late at night. *Cf. Amundsen v. Jones*, 533 F.3d 1192, 1198-99 (10th Cir. 2008) (discussing numerous cases from the Tenth Circuit holding that "weaving between lanes provides reasonable suspicion of driving under the influence"); *United States v. Colin*, 314 F.3d 439, 445 (9th Cir. 2002) (noting that "in some cases, evidence of weaving might be indicative of driving under the influence," but finding no reasonable suspicion of driving under the influence where the driver merely touched the right fog line and the center yellow line after two lawful lane changes). Ms. Levy and Ms. Harwe also believe that their admission to having a glass of wine each after initially insisting they had not been drinking, should have have dispelled Officer Floyd's suspicion. But the Court believes that the admission was actually further evidence supporting Officer Floyd's already reasonable suspicion that Ms. Levy had been driving under the influence. *See, e.g., Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1207 (10th Cir. 2008) ("Vondrak's statement that he 'had one beer three hours ago' provided McCants with reasonable suspicion to conduct the field sobriety tests . . . .").

Officer Floyd employed ordinary and perfectly reasonable investigative techniques in an attempt to confirm his reasonable suspicion that Ms. Levy was driving under the influence. He first administered standard field sobriety tests. *See, e.g.*, *id.* at 1206 (finding that the driver's statement that he drank a single beer three hours before the stop justified the officer's decision to administer standard field sobriety tests). When Ms. Levy failed two of the standard field sobriety tests and all the while pleaded for Officer Floyd to stop administering the tests – a point at which Officer Floyd might even have had probable cause to arrest Ms. Levy for driving under the influence, *see, e.g.*, *Corcoran v. Higgins*, No. 1:08cv10734 (HB), 2010 WL 1957231, at *4 (S.D.N.Y. May 13, 2010) (finding probable cause to arrest a driver for driving under the

influence when the driver failed three of four field sobriety tests and also had difficulty communicating with the officer) – he instead decided to place Ms. Levy in the police cruiser.[16]

A reasonable jury would have to conclude that it was reasonable for Officer Floyd to take the step of placing Ms. Levy inside the police cruiser after Ms. Levy failed the field sobriety tests and acted erratically – begging Officer Floyd to stop the tests – while the tests were still being administered.[17] Officer Floyd left Ms. Levy in the police cruiser for a few minutes before returning and questioning her again about whether she had been drinking. When Ms. Levy again insisted she had not been drinking, Officer Levy left her in the police cruiser and went back to the Mercedes to question Ms. Harwe – a step that even Ms. Levy must admit was reasonable, as she herself had begged Officer Floyd throughout the stop to go back to the Mercedes and to examine the "proof" that she had not been drinking. *See* Ex. 3 to Mem. in Opp. [doc. # 47-4] at 15-16. After questioning Ms. Harwe and looking at the Legal Sea Foods receipt, Officer Floyd concluded – *correctly* – that Ms. Levy and Ms. Harwe had indeed consumed alcohol, and confronted Ms. Levy with that fact. When she refused to say that she had been drinking, he left her in the police cruiser again and had a conversation with other officers on the scene. Officer Floyd then decided to let Ms. Levy go on her way. In the Court's view, no reasonable jury could find other than that the steps he took were "the least intrusive means reasonably available to verify or dispel [Officer Floyd's] suspicion in a short period of time.'" *Gilles*, 511 F.3d at 245.

---

[16] Ms. Levy's and Ms. Harwe's counsel has suggested that Officer Floyd's decision to place Ms. Levy in the police car was unreasonable. However, he has not argued that the investigatory detention ripened into a *de facto* arrest without probable cause at that point. *See, e.g.*, *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (listing the factors the Second Circuit considers "[i]n determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest"). The Court therefore concludes that the later argument has been waived.

[17] Ms. Levy's and Ms. Harwe's counsel has not cited a single case which stands for the proposition that taking such a step in the course of an investigatory traffic stop is unreasonable, and the Court has not found any such case through its own research.

Officer Floyd had no obligation to accept Ms. Levy's explanation about why she failed the field sobriety tests, and no obligation to examine her scar or the unspecified "proof" she offered.

In addition, no reasonable jury could find other than that the duration of the investigatory traffic stop was perfectly reasonable. The record evidence shows that at most, the stop lasted a total of thirty-one minutes. Ms. Levy may have subjectively believed that she was inside Officer Floyd's police cruiser for longer – indeed, it is not surprising that time would seem to pass slowly under the circumstances – but her subjective belief is contradicted by all of the documentary evidence in the record. A jury finding that the stop occurred anytime before 10:18 p.m. would be based on pure speculation, and simply put, it would be irrational for a jury to conclude that Ms. Levy was still sitting inside Officer Floyd's police car at 11:10 PM when her own telephone records indicate that she has already dropped Ms. Harwe off at her home almost fifteen minutes earlier than that. Officer Floyd's investigation included a number of steps, each of them time-consuming. *Cf. United States v.* Garcia, 613 F.3d 749, 752 (8th Cir. 2010) (observing that even during a routine stop based on a simple traffic violation, an officer may detain a driver while "completing 'a number of routine but somewhat time-consuming tasks'"). No reasonable jury could find that thirty-one minutes is too long for such an investigation to last.

Finally, while the Fourth Amendment requires that an investigatory traffic stop be "temporary and last no longer than necessary to effectuate the purposes of the stop," *Gilles*, 511 F.3d at 245, it cannot be that Officer Floyd's investigation became unreasonable simply because Officer Floyd left Ms. Levy alone twice during the course of his investigation to talk to other officers on the scene. There is simply no evidence from which a jury could conclude that Officer Floyd's conversations with the other officers were unrelated to the investigation which was still

ongoing at the time.[18] Ms. Levy's and Ms. Harwe's counsel has made much of the fact that another officer stood by pointing and laughing at Ms. Levy. But the Court frankly does not understand how Officer Floyd could be held liable on account of *a different officer's* pointing and laughing at Ms. Levy while she was inside the police cruiser. This case is about the reasonableness of Officer Floyd's actions only, as he is the only Defendant in the case.

Although the Court concludes that no reasonable jury could find that the scope and duration of the investigatory traffic stop violated the Fourth Amendment, the Court will nevertheless consider the second prong of the qualified immunity analysis. It has long been recognized in this Circuit that the Fourth Amendment protects against investigatory detentions that are of unreasonable scope or duration. *See Fassett By & Through Fassett v. Haeckel*, 936 F.2d 118, 120 (2d Cir. 1991) ("[E]ven if the jury accepted Haeckel's contention that the stop, at its inception, was a lawful investigatory detention . . . it could reasonably have rested its finding of liability on an alternative ground – namely, that the duration of the stop was unreasonably prolonged." (quoting *Royer*, 460 U.S. at 500)). However, that alone does not end the second prong of the analysis. Under the second prong, "the relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). As the Second Circuit has sometimes put it: "[E]ven where the law is clearly established and the scope of an official's permissible conduct is clearly defined, the qualified immunity defense also protects an official if it was objectively

---

[18] Neither side introduced deposition testimony from Officer Floyd or from any other officers present on the scene about those conversations. Counsel for Ms. Levy and Ms. Harwe could have asked the other officers about what Officer Floyd said to them, but he apparently elected not to do so.

reasonable for him at the time of the challenged action to believe his acts were lawful." *Taravella*, 599 F.3d at 134.[19]

Even if the scope or the duration of the investigatory traffic stop was unreasonable, it was objectively reasonable for Officer Floyd to believe at the time that he was acting in accordance with the law. *See id.* No case decided by the Supreme Court or the Second Circuit could have put Officer Floyd on notice that he exceeded the bounds of the Fourth Amendment by investigating Ms. Levy on suspicion of driving under the influence. No cases decided by those courts suggest that a sudden, signal-less highway lane change combined with an admission by a driver that she has consumed one alcohol beverage is insufficient to create a reasonable suspicion that the driver is under the influence of alcohol. Furthermore, cases decided by other federal Courts of Appeal suggest that the facts known to Officer Floyd are sufficient to give rise to at least arguably reasonable suspicion. *See, e.g., Vondrak*, 535 F.3d at 1207 (holding that at the very least, an admission by a driver to drinking one alcoholic beverage provided the officer with "'arguable reasonable suspicion' entitling [the officer] to qualified immunity.").

In addition, no case decided by either the Second Circuit or the Supreme Court even remotely casts doubt on the lawfulness of the specific techniques Officer Floyd employed to conduct his investigation. No case decided by either of those Courts could have put Officer Floyd on notice that an investigatory traffic stop which included field sobriety tests and separate

---

[19] As some judges on the Second Circuit have observed, that formulation is occasionally recited as though it were a separate, third prong of the qualified immunity analysis. *See Taravella*, 599 F.3d at 137 (Straub, J., dissenting); *Walczyk v. Rio*, 496 F.3d 139, 166-67 (2d Cir. 2007) (Sotomayor, J., concurring). In this Court's view, it is quite clear that whether a defendant officer knew or should have known at the time that her conduct was unlawful and whether the law was clearly established at the time are really two different ways of stating that same question. *See Saucier*, 533 U.S. at 202.

interviews with a driver and her passenger might become unreasonable simply because it lasted longer than thirty minutes. And no case decide by either of those courts could have put Officer Floyd on notice that leaving a suspect alone in a police cruiser for briefs periods of time during an investigatory traffic stop is unreasonable. Thus, even if the scope and duration of the traffic stop exceeded the permissible bounds of the Fourth Amendment, Officer Floyd would still be entitled to qualified immunity on Ms. Levy's and Ms. Harwe's scope and duration claim.

**B.**

Ms. Levy also claims that Officer Floyd used excessive force against her during the investigatory traffic stop. Officer Floyd asserts that he is entitled to qualified immunity on that claim as well as on the scope and duration claim. Again, the Court begins with the first prong of the qualified immunity analysis because doing so may make consideration of the second prong unnecessary. *See Pearson,* 129 S. Ct. at 818; *Tracy* 623 F.3d at 96.

A police officer's "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 390 U.S. at 396. However, the Fourth Amendment requires that the force used by an officer in the course of an arrest or investigatory detention be reasonable. *Id.* at 395. "Because the Fourth Amendment test of reasonableness is one of objective reasonableness, the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy*, 623 F.3d at 96 (quotation marks and citations omitted). In conducting that balancing in the context of an investigatory detention, this Court considers: (1) the nature and severity of the suspected crime being investigated, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting the officer or attempting to

evade custody by flight. *Cf. id.* (listing the three similar factors that courts in this Circuit must consider in the context of an arrest).

There is one additional caveat to that balancing analysis. In assessing any excessive force claim, this Court must take care "to evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quotation marks and citation omitted). The Court must "make 'allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* (quotation marks and citation omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 397 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J.)).

The Court notes that no excessive force case decided by either the Second Circuit or the Supreme Court has dealt with the issue the Court faces here: whether it is reasonable for an officer to use a minimal amount of force to guide a distraught suspect into his police cruiser during the course of an otherwise lawful investigatory traffic stop. Moreover, the handful cases in which those two courts have considered the reasonableness of force used by an officer during an investigatory detention have involved much more significant uses of force. For example, in *Hayes v. New York City Police Department*, 212 Fed. App'x 60 (2d Cir. 2007) (summary order), the defendant officer struck the suspect on the head with his gun as the suspect attempted – with his hands raised in the air – to walk around the officer. *See id.* at 62. The Second Circuit reasoned in that case that it could not say as a matter of law that the force used by the offer was reasonable, noting that "we are not dealing with 'pushes and shoves' but [with] allegations

involving the use of a gun" to strike a suspect on the head. *Id.* (quoting *Graham*, 490 U.S. at 396).

The Court must also pause briefly to observe that Ms. Levy's and Ms. Harwe's counsel has asserted in opposition to summary judgment on the excessive force claim that the facts underlying *Tekle v. United States*, 511 F.3d 839 (9th Cir. 2007), a Ninth Circuit decision reversing a grant of summary judgment in favor of the defendant officers on an excessive force claim, *see id.* at 842, are especially instructive. But in the Court's view, the case before it and *Tekle* could hardly have less in common. In *Tekle*, a team of twenty-three federal agents approached the Tekle family's home to execute warrants for the arrest of a husband and wife for suspected drug trafficking. *See id.* The agents arrested the wife without incident outside the home, and before they tried to enter the home, the wife warned them that her eleven-year-old son – the plaintiff in the excessive force case – was at home. *See id.* When the eleven-year-old son emerged from the house, the agents ordered him to get on the ground. *See id.* at 842-43. He was then handcuffed, brought out of the house, and forced to sit on a stool while fifteen to twenty agents pointed their loaded guns at him. *See id.* at 843. *Tekle* involved a very significant use of force – pointing load guns – against an eleven-year-old innocent bystander to an arrest – an eleven-year-old who was himself not suspected of any wrongdoing, either reasonably or unreasonable. It is utterly implausible and irresponsible for Ms. Levy's and Ms. Harwe's counsel to claim before this Court that the facts of his clients' case are anything like those of *Tekle*.

As the Court has already observed, the use of force at issue in this case is much less significant than the use of force at issue in any Supreme Court or Second Circuit case this Court is aware of. Indeed, this case involves little – if anything – more than the minimal pushes and shoves that Judge Friendly contemplated nearly thirty years ago. *See Johnson*, 481 F.2d at 1033

(Friendly, J.). The Court cannot overlook the fact that the Supreme Court has cited Judge Friendly's observation about minimal pushes and shoves approvingly. *See Graham*, 490 U.S. at 397. Nevertheless, the Court is also unaware of any Second Circuit or Supreme Court case indicating that it might be reasonable for an officer to use even minimal force against a fully compliant drunk driving suspect during an investigatory traffic stop.

With that in mind, the Court concludes that there is some possibility, albeit remote, that taking all of the evidence in the light most favorable to Ms. Levy, a reasonable jury could find that Officer Floyd used excessive force against her. Depending on how a jury resolved the factual dispute relevant to that claim, it might reasonably conclude that Officer Floyd used excessive force at the moment when he grabbed Ms. Levy by the left arm, pulled her, and used his hands and body to guide her into the police car, regardless of whether it resulted in Ms. Levy's hitting her head against the police cruiser. A jury might also reasonably conclude – again, depending on how it resolved the remaining factual disputes in this case – that Officer Floyd used excessive, unreasonable force when he quickly closed the door of the police cruiser onto Ms. Levy's foot, even if he did not specifically intended the door to hit Ms. Levy's foot.

The most significant dispute that this Court is unable to resolve without the aid of a jury is whether Ms. Levy was compliant when Officer Floyd decided to use force against her. Ms. Levy's and Ms. Harwe's counsel suggests in opposition to summary judgment that Ms. Levy was fully compliant, and the Court agrees that the evidence in the record could potentially support such a finding. If a jury found that Ms. Levy was fully complaint, it might find that even a very minimal use of force against Ms. Levy would have been unreasonable. *See Palshook v. Jarrett*, 120 F. Supp. 2d 641, 655 (N.D. Ohio 2000) ("[P]laintiff is correct that where no force is necessary to effect an arrest none is permitted . . . ."). On the other hand, a jury might also find

based on the fact that Ms. Levy had failed two field sobriety tests, was distraught, and was on the verge of tears and begging Officer Floyd to cease his investigation that she was *not* complying with the investigation when Officer Levy decided to use minimal force to place her into his police cruiser. *See, e.g.*, Ex. 3 to Mem. in Opp. [doc. # 47-4] at 15-16 ("Please don't do that, please don't do that. I must have asked him please 85 million times."). If the jury found that Ms. Levy was not compliant, it might reasonably conclude that Officer Floyd's decision to utilize minimal force in order to place Ms. Levy into the police cruiser – that is, grabbing her by the left arm, pulling her, and placing his body against hers to guide her into the back seat – was a perfectly reasonable decision.

The Court also believes there is a genuine dispute of material fact as to whether it was Officer Floyd's conduct, or Ms. Levy's own conduct, that resulted in Ms. Levy's bumping her head against the police cruiser. A jury might reasonably find that the issue of the bump on the head is a red herring. Based on Ms. Levy's deposition testimony, it would be reasonable to conclude that Ms. Levy actually *hit her own head* against the frame of the police cruiser when she was attempting to get into it, and that it was only after she hit her head that Officer Floyd pressed his body against her in an attempt to guide her into the police cruiser. *See* Ex. 3 to Mem. in Opp. [doc. # 47-4] at 18 ("I hit my head going in, because there was no leg room, because you sit on these vinyl seats – not vinyl – plastic seats. . . . Like, when he pulled my arm, and then he was, like, get in. It was tough for me to get in. I hit my head and I went back with my head. So, *then* he kind of like pushed with his body, but not – he wasn't trying to push. I mean, his body [was] against me so I couldn't go anyplace else." (emphasis added)); *id.* at 26 ("I went to sit down. But like I said, there's no leg room. So, you had no place to put anything and that's *when I hit my head going down* . . . ." (emphasis added)). On the other hand, the Court cannot say with

certainty that no reasonable jury could find that it was Officer Floyd's conduct that caused Ms. Levy to bump her head against the car.

Finally, there is a factual dispute regarding whether Officer Floyd acted reasonably when he rapidly closed the police cruiser door onto Ms. Levy's foot. If a jury were to conclude that Ms. Levy was acting unruly, was not complying with Officer Floyd's investigation, and posed a flight risk, it could well conclude it was reasonable under the circumstances for Officer Floyd to decide to close the door quickly after he directed Ms. Levy into the police cruiser. The Court cannot say for sure whether she posed a flight risk, though Ms. Levy herself speculated in her deposition testimony that Officer Floyd "closed [the door] pretty fast" because "[h]e thought I was going to run away." Ex. 3 to Mem. in Opp. [doc. # 47-4] at 26. It will be up to the jury to decide whether Officer Floyd had any reason to believe Ms. Levy might flee, and if so, whether it was reasonable for him to close the door so rapidly as to risk a possible injury to Ms. Levy.

The Court emphasizes that the relevant questions that a jury must decide are about whether *the decisions that Officer Floyd made* – namely, using his hands and body to guide Ms. Levy into the police cruiser and rapidly closing the door before Ms. Levy had a chance to climb all the way insider – were reasonable decisions under the totality of the circumstances and without using hindsight. *See Tracy*, 623 F.3d at 97 ("[The officer's] decision to use his flashlight to protect himself and subdue an arrestee he perceived to be actively resisting was therefore a reasonable response."). To give an example, there does not appear to be any evidence that Officer Levy made a decision to deliberately close the door onto Ms. Levy's foot. *See Elliott v. Cnty. of Monroe*, 115 Fed. App'x 497, 429 (2d Cir. 2004) (summary order) (reasoning that among the questions precluding summary judgment for the defendant officer was where "to the extent . . . force was used, was it deliberate or was some conduct . . . accidental?"). But a jury

might still find Officer Floyd liable if it concluded that when he decided to close the door quickly, Officer Floyd decided to ignore the possible risk of injury to Ms. Levy. *See* Ex. 3 to Mem. in Opp. [doc. # 47-4] at 28-29 ("He was just mean and rude and he didn't care. . . . He's not sitting there going, 'I'm going to slam this door on this woman right now.'").

That said, the Court notes in closing that a number of relevant facts are *not* in dispute. As the Court has already observed, Officer Levy reasonably suspected Ms. Levy of a serious crime. As the Supreme Court observed in *South Dakota v. Neville*, 459 U.S. 553 (1983): "The situation underlying this case – that of drunk driving – occurs with tragic frequency of our Nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court . . . has repeatedly lamented the tragedy." *Id.* at 559. Furthermore, there can be no dispute that if Officer Floyd had simply allowed Ms. Levy to leave before he could determine whether she was actually under the influence of alcohol, Ms. Levy could have posed a serious threat to other drivers. It will be up to a jury to decide whether, in light of those circumstances and in light of all the other facts, Officer Floyd's actions were reasonable.

Because the Court cannot say that "the relevant facts do not make out a constitutional violation at all," *Pearson*, 129 S. Ct. at 818, the Court must consider the second prong of the qualified immunity analysis. At the time of the investigatory traffic stop at issue in this case, it had long been established that the Fourth Amendment includes the right to be free from excessive force during an investigatory detention. *See Graham*, 490 U.S. 394. But again, under the second prong of the qualified immunity analysis, the dispositive question is whether "it was objectively reasonable for [Officer Floyd] at the time of the challenged action to believe his acts were lawful." *Taravella*, 599 F.3d at 134. The same factual disputes that prevent the Court from finding that the relevant facts do not make out a constitutional violation also prevent the Court

from saying with any certainty that it was objectively reasonable for Officer Floyd to believe that his actions were lawful at the time he took them. If a jury finds based on the evidence presented at trial that Ms. Levy was entirely cooperative, that Ms. Levy posed no flight risk, and that no use of force whatsoever would have been reasonable, Officer Floyd would likely not be entitled to qualified immunity. Officer Floyd should renew his qualified immunity argument by filing a motion for judgment as a matter of law pursuant to Rule 50(a) at trial.

## IV.

In sum, the Court concludes that there are no genuine disputes of material fact regarding Ms. Levy's and Ms. Harwe's scope and duration claim, and that Officer Floyd is entitled to summary judgment on that claim. However, the Court also concludes that there are genuine disputes of material fact regarding Ms. Levy's excessive force claim. Those factual disputes prevent the Court from saying with certainty that Officer Floyd is entitled to qualified immunity on Ms. Levy's excessive force claim. For those reasons, Officer Floyd's Motion for Summary Judgment [doc. # 41] is GRANTED in part and DENIED in part. **The Court directs the Clerk to terminate Ms. Harwe as a Plaintiff in this case.**

IT IS SO ORDERED.

                     Mark R. Kravitz
                  United States District Judge

**Dated at New Haven, Connecticut: February 17, 2011.**